UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE WOODS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>SIRIUS XM RADIO INC, et al.,<br><br>    Defendants. | Case No. 24-cv-03799-WHO<br><br>**ORDER DENYING THE MOTION TO COMPEL ARBITRATION, GRANTING THE MOTION TO SEAL, AND SETTING CASE MANAGEMENT CONFERENCE**<br><br>Re: Dkt. Nos. 37, 38 |

Denise Woods and Sherry Tapia bring this action on behalf of a putative class of California Sirius XM Radio subscribers. They allege that defendant Sirius XM Radio, Inc. ("Sirius XM") engaged in a deceptive pricing scheme that resulted in customers unknowingly paying 21.4% higher prices for services than Sirius XM advertised. Sirius XM moves to compel arbitration pursuant to an arbitration provision included in the Sirius XM Customer Agreement. The parties dispute whether plaintiffs received reasonable notice of the contents of the Customer Agreement, and so dispute whether plaintiffs legally contracted to arbitrate any disagreements. Because I conclude that there was no manifest assent between plaintiffs and Sirius XM concerning the arbitration agreement prior to entering into contract, I DENY the Motion to Compel.

## BACKGROUND

**A. Factual Background**

Sirius XM is a New York based company that provides satellite radio and internet-based music streaming plans to approximately 33.9 million consumers nationwide, including 3.97 million residents in California. First Amended Complaint ("FAC") ¶ 15. Most Sirius XM

subscribers use the music plans in their cars. FAC ¶¶ 15, 18. More than 100 million vehicles come with Sirus XM satellite radio pre-installed and more than 13 million people who purchase a new vehicle are provided a free trial of Sirius XM each year. FAC ¶ 18.

Plaintiffs Denise Woods ("Woods") and Sherry Tapia ("Tapia") (together, "plaintiffs") allege that in addition to the rate advertised to its customers for its radio and streaming services, Sirus XM charged an additional hidden fee, called the "U.S. Music Royalty Fee." FAC ¶ 2. Sirius XM first added the U.S. Music Royalty Fee to its satellite radio plans in 2009, charging a 13.9% flat rate. FAC ¶ 24. Over time, the rate increased to its current rate of 21.4%.[1] FAC ¶ 24. Plaintiffs allege that Sirius XM failed to disclose these fees until at least June of 2023. FAC ¶87.

Sirius XM customers' subscriptions are set up for automatic renewal and Sirius XM does not send its customers any ongoing billing notifications or invoices. FAC ¶ 54. Plaintiffs contend that Sirius XM did not disclose the U.S. Music Royalty Fee on any bill, marketing email, or online informational page concerning the subscriptions at issue. FAC ¶¶ 54, 56–57.

When customers asked Sirius XM about the U.S. Music Royalty Fee, Sirius XM had a practice of telling them that it was a "government mandated" fee and a legitimate pass-through charge from Congress that "Sirius XM is required by law to pay." FAC ¶¶ 60–61. According to plaintiffs, however, the U.S. Music Royalty Fee was a significant profit source for Sirius XM and was in no way required by any government entity. FAC ¶ 25. None of Sirius XM's competitors (e.g., Apply Music, Spotify, Amazon Music, Google Play Music) charge a separate royalty fee in addition to their advertised music plan prices. FAC ¶ 27. In sum, plaintiffs allege, the U.S. Music Royalty Fee was an unlawfully disguised "double charge" for the music plan itself, concealed as "fees and taxes," when no other fee or tax was charged to the customer. FAC ¶ 27.

---

[1] Plaintiffs assert that, although the Sirius XM internet-streaming plan likewise charges a U.S. Music Royalty Fee, it is at the much reduced rate of 8.8%. FAC ¶ 17. They describe the "overwhelming majority" of Sirius XM users to be satellite radio subscribers. *Id.*

**1.      Woods's Communications With Sirius XM**

In 2019, Woods's late husband bought a car that came with a free Sirius XM music plan trial subscription.  FAC ¶¶ 65, 67.  After the free trial ended, Woods's husband called Sirius XM and purchased a new music plan after discussing promotional subscriptions with an agent.  FAC ¶ 65.  The agent did not mention the U.S. Music Royalty Fee.  FAC ¶ 65.  Woods's husband called again the following year and purchased another one-year subscription.  FAC ¶ 66.  Again, the Sirius XM agent did not mention the U.S. Music Royalty Fee.  After Woods's husband passed away in 2022, Woods began calling Sirius XM herself to purchase one-year satellite radio subscriptions.  FAC ¶¶ 68–69.  At no point did any Sirius XM agent discuss the U.S. Music Royalty Fee with her.  FAC ¶ 70.

As is relevant to the motion now before me, at the conclusion of each of Woods's phone calls with a Sirius XM representative, the representative read a script.  An example script from Woods's February 2024 call with a Sirius XM representative follows:

> The last step now before completing the process, we are required to read the terms and conditions basically about the promotion, the process I completed today. . . . So let's go over the details.  The 12 months Sirius XM platinum plan you chose starts today and comes to [cost of service] for the initial billing period, which includes fees and taxes.  The charge for your initial term is pro rated . . . .  [2]  Subscription fees for audio plans are non-refundable.  Your service will automatically renew on [date of renewal].  Your renewal will bill every 12 months, then current rates [sic] for an estimate of a total charge of [new charge] which includes fees and taxes.
>
> You may cancel at any time to stop future renewables by calling us . . . or through online means describe[ed in] our customer agreement.  Your first invoice will be sent today and it is due upon receipt.  You will receive an invoice for future charges that includes a two dollars invoice administration fee added to each bill.
>
> Your customer agreement, including the refund policy can be found on our website, at SiriusXM dot com or you can request a copy at any time by phone.  Important notifications about your subscription will be sent by email.  If there is an email address on your account,

---

[2] In the transcript of the 2024 call, Woods interrupted the representative at this point, stating: "I got it.  You don't have to read the whole thing. I understand."  After explaining that "legally, it is the procedure [Sirius XM representatives] have to follow," Woods allowed the representative to continue.  Dkt. 38-2 at 17–18.

3

a confirmation of this transaction will be sent to that address within five days.

Do you accept these terms, and may I have your permission to send you an invoice today for [the cost] and for future charges.

*See* Dahir Decl. [Dkt. No. 38-2] Exh. 2 (Transcript of Feb 2024 Woods/Sirius XM Call) at 17–19. For each of her transactions over the years, in response to the final question Woods always answered: "Yes." *Id.* The representative did not mention the arbitration provision of the Sirius XM Customer Agreement ("the Customer Agreement").

After each phone conversation with Sirius XM, Woods chose to have Sirius XM mail her an invoice so that she could send in a check to finalize her subscription. *See* Dahir Decl. [Dkt. No. 38-2] Exh. 2 (Transcript of Feb 2024 Woods/Sirius XM Call) at 16. Each invoice was two pages long. The first page of the invoice includes the amount Woods owed for the subscription along with a breakdown of the charges included. *See* Dahir Decl. Exh. 3 (Woods's February 2024 Invoice) at 30. The second page of the invoice includes a section titled: "IMPORTANT INFORMATION." *Id.* at 31. The first sentence reads: "It is important that you read the Sirius XM Customer Agreement available at Siriusxm.com because activation of your service means that you have agreed to its terms." *Id.* At the bottom of the page, in bold italic font, the invoice states: "By enclosing a check or providing my payment information below, I authorize my payment and agree to the AUTOMATIC RENEWAL TERMS above, and the Sirius XM Customer Agreement, including refund policy, available at siriusxm.com." *Id.* There is no mention of the arbitration provision, and neither party alleges that Sirius XM included any additional information, including but not limited to the full Customer Agreement, when it mailed Woods her invoice. After receiving each invoice, Woods mailed Sirius XM a check to continue receiving Sirius XM radio services.

Sirius XM also sent a confirmation email after Woods's phone calls that contained the most recent terms of the subscription and information about her payment. *See* Dahir Decl. Exh.

4

3A (Woods 2024 Email Confirmation) [Dkt. No. 38-2] at 33. Each email starts: "This email confirms your recent SiriusXM account transaction." *Id.* Each confirmation email explained: "Your subscription is governed by the Sirius XM Customer Agreement." *Id.* (showing that "Customer Agreement" was hyperlinked and written in blue, underlined text).

The first page of the Customer Agreement includes a statement that is boxed, bolded, and in all caps. It reads:

> ANY DISPUTE BETWEEN US, UNLESS PROVIDED OHERWISE HEREIN, WILL BE RESOLVED BY BINDING ARBITRATION ON AN INDIVIDUAL BASIS AS OUTLINED IN SECTION 13 BELOW. YOU ARE WAIVING YOUR RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY.

Customer Agreement, Stephens Decl. Exh. 1[Dkt. No. 38-4] at 4. Section 13, titled "RESOLVING DISPUTES" begins by stating:

> PLEASE READ THE PROVISIONS OF THIS SECTION CAREFULLY. THESE DISPUTE RESOLUTIONS PROVISIONS PROVIDE THAT ANY DISPUTE MAY BE RESOLVED BY BINDING ARBITRATION. YOU ARE HEREBY WAIVING THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY. IN ARBITRATION, A DISPUTE IS RESOLVED BY AN ARBITRATOR, OR A PANEL OF ARBITRATORS, INSTEAD OF A JUDGE OR JURY.

*Id.* at 14. The arbitration provision continues on for several pages and includes an explanation of the process a Sirius XM subscriber could use to opt-out of the arbitration provision. *Id.* at 14–19, 17 (requiring users wishing to opt out of the arbitration provision to do so within "thirty (30) days from the date of purchase or the start of [a] Subscription, whichever comes first."). The arbitration provision of the Customer Agreement also contains a Class Action Waiver, not at issue in this motion. *See Stevenson et al. v. SiriusXM Radio*, No. 23-CV-02367-WHO, Dkt. No. 42 (Order Granting Motion to Compel Arbitration and Dismissing Case).

### 2. Tapia's Communications With Sirius XM

Plaintiffs allege that Tapia had a similar experience to Woods and her husband, although her customer relationship with Sirius XM began in 2017. FAC ¶ 80. In 2018, Tapia signed up for two additional music plan subscriptions. Initially, Tapia signed up to begin or to continue her

music plan subscriptions via phone call with Sirius XM—similar to Wood's experience described above. But, beginning in 2020, Tapia started using Sirius XM's online chat feature to seek promotional offers and continue her subscription services. FAC ¶¶ 84–85. Tapia likewise received only brief mention of the Customer Agreements during any communication with a Sirius XM representative. For example, during a July 2022 online conversation with a Sirius XM representative, the agent offered Tapia an annual plan of $60 plus fees. *See Dahir* Decl. Exh. 11 (July 2022 Tapia Chat Transcript) [Dkt. No. 38-2] at 60. After Tapia initially accepted the proposal, the agent began the formal, scripted process:

> Let's go ahead and process this for you. To complete the changes, I will be sending you the terms and conditions in a series of messages. Please read through it and let me know if you agree. . . .
>
> Let's go over the details. The . . . Sirius XM Music & Entertainment plan you chose starts today. Your bill is [the cost] for the initial period, which includes fees and taxes. . . . Your service will automatically renew on July 01, 2023. . . . You may cancel at any time by calling us at [phone number redacted]. Your Customer Agreement including the refund policy can be found on our website at: siriusxm.com or you can request it at any time by phone. If there is an email address on your account, a confirmation of this transaction will be sent to that email address within 5 days. Do you accept these terms? And may I have your permission to charge you card ending in [redacted] now for [total cost], and for all future charges?

*Id.* at 61. For each chat pertaining to each of her subscriptions, Tapia responded: "yes." *Id.* At no point did the Sirius XM agent send a hyperlink of the Customer Agreement or explain that there was an arbitration provision included in the Customer Agreement.[3]

Like Woods, Tapia received an email confirmation following each transaction with a Sirius XM representative. *See* Dahir Decl. Exh. 12 (July 2022 email confirmation) at 65. Both Woods and Tapia have continued their Sirius XM subscription plans and have expressed a desire to continue to use Sirius XM plans in the future. FAC ¶¶ 75, 88.

---

[3] The website mentioned in the Chat Transcript, siriusxm.com, does not link directly to the Customer Agreement.

6

**B. Procedural Background**

Plaintiffs filed their initial complaint on June 25, 2024. *See* Complaint [Dkt. No 1]. On February 5, 2025, they filed their First Amended Class Action Complaint. FAC [Dkt. No. 33]. On March 21, 2025, Sirius XM filed its Motion to Compel Arbitration.[4] ("Mot.") [Dkt. No. 38]. Plaintiffs opposed the Motion ("Oppo."), and Sirius XM replied ("Repl."). Dkt. Nos. 41, 45.

In the FAC, plaintiffs allege three causes of actions against Sirius XM: (1) violation of the Consumers Legal Remedies Act ("CLRA") pursuant to California Civil Code § 1750 *et. seq.*, FAC ¶¶ 118–141; (2) violation of California's False Advertising Law ("FAL") pursuant to California Business and Professions Code § 17500 *et seq.*, FAC ¶¶ 142–156; and (3) violation of California's Unfair Competition Law ("UCL") pursuant to California Business and Professions Code § 17200 *et seq.*, FAC ¶¶ 157–173.

In its Motion, Sirius XM asserts that plaintiffs had inquiry notice of the Customer Agreement and manifested assent to it and all of its contents—including the arbitration provision. Sirius XM contends that therefore, plaintiffs are bound to the terms of the arbitration provision and may not pursue a remedy in court. *See generally* Mot. I held a hearing on the motion on June 25, 2025.

**LEGAL STANDARD**

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration. 9 U.S.C. §§ 1 et seq. Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an

---

[4] Sirius XM also filed an administrative motion to seal limited portions of the exhibits attached in support of its Motion to Compel Arbitration. *See* Dkt. No. 37. The redacted information represents Woods's and Tapia's personal information shared with Sirius XM in the process of signing up for Sirius XM subscriptions. Sirius XM has already filed redacted versions of those exhibits on the docket. Compelling reasons shown, the administration motion to seal is GRANTED. *See Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178–1181 (9th Cir. 2006).

7

1    arbitration agreement, federal courts should apply ordinary state-law principles that govern the
2    formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003)
3    (internal quotation marks and citation omitted).
4        If the court is satisfied "that the making of the arbitration agreement or the failure to
5    comply with the agreement is not in issue, the court shall make an order directing the parties to
6    proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "Any doubts
7    concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Simula, Inc.
8    v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).

**DISCUSSION**

### I.    Enforceability of the Arbitration Agreement

Applying "ordinary state law," "[i]t is undisputed that under California law, mutual assent is a required element of contract formation." *Ingle*, 328 F.3d at 1170 (citations omitted); *Knutson v. Sirius XM Radio, Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Unless a party has "agreed [] to submit" a dispute to arbitration, then, it cannot be required to submit to arbitration. *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960). "Mutual assent may be manifested by written or spoken words, or by conduct . . . and acceptance of contract terms may be implied through action or inaction. *Knutson*, 771 F.3d at 565 (citing *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999) and *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595–95 (1991)). But "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972).

The Ninth Circuit has held that

> an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

8

*Berman v. Freedom Financial Network, LLC*, 30 F. 4th 849, 856 (9th Cir. 2022). Sirius XM argues that because "inquiry notice" is all that is required to demonstrate an enforceable contract, it has met its burden to move to compel arbitration because: (1) each customer representative speaking with Woods or online chatting with Tapia mentioned the existence of the Customer Agreement; (2) Woods's invoice mentioned the Customer Agreement and included the Sirius XM website where she could locate the Agreement; and (3) The confirmation emails sent after Woods's and Tapia's conversations with Sirius XM customer representatives during which they agreed to the "terms" mentioned in the conversation included a visible hyperlink to the Customer Agreement. Mot. 13–14.

Sirius XM has not met its burden to demonstrate either that it "provide[d] reasonably conspicuous notice of the terms to which" Woods or Tapia would be bound or that either plaintiff took "some action . . . that unambiguously manifest[ed] . . . [their] assent to those terms." *Id.* As plaintiffs explain in their Opposition, the Sirius XM representatives described only six terms during their conversations with Woods and Tapia—either via phone or through the online chat portal. Oppo. 12. Specifically, these terms include: (1) the monthly price of the subscription; (2) the type of plan purchased; (3) the length of the service term; (4) the automatic renewal of the plan (with the ability to cancel); (5) Sirius XM's refund policy; and (6) Sirius XM's cancellation policy. Oppo.12. Because each representative offered only "these terms" during Woods's phone calls or Tapia's online chat, any manifest assent can only be in reference to "these terms." That the Sirius XM representatives mentioned the mere existence of the Customer Agreement is not enough, in itself, to secure an understanding of mutual assent to the arbitration clause contained within the Customer Agreement.

A review of the Sirius XM script reveals the confusing manner in which the Customer Agreement is discussed. After stating the pricing of the plan and the length of the individual

service term, a representative reads: "Your Customer Agreement, including the refund policy, can be found on our website at siriusxm.com or you can request a copy at any time be phone. Important notifications about your subscription will be sent by email." Tapia June 2024 Chat Transcript [Dkt. No. 37-4] at 93. Immediately afterward, without sending a hyperlink of the hardly mentioned Customer Agreement or even briefly noting something akin to "Your Customer Agreement, which contains the full explanation of all terms and policies to which you are bound, . . ." the representative asks: "Do you accept these terms?" *Id.*

Which terms? One obvious understanding of the Sirius XM agent's question is, as plaintiffs argue, whether a customer agrees to the terms immediately laid out in the conversation prior to the question. Sirius XM asks that I interpret the question to mean, and to solely mean, "these terms" as included in the Customer Agreement. But how would the consumer know those terms without having been provided a copy or means to review a copy? Nowhere in a representative's script is it mentioned that the Customer Agreement has additional "terms" or any "terms" at all. And because Sirius XM does not immediately direct its customers to the existence of any arbitration provision of the Customer Agreement, it is difficult to adopt its argument that Woods and Tapia knowingly agreed to that provision. The "principle of knowing consent applies with particular force to provisions for arbitration." *Windsor Mills, Inc.*, 25 Cal. App. at 993.

Sirius XM asks that I consider cases in other courts that are, admittedly, grounded in incredibly similar facts to these. Each is distinguishable for an important reason. Sirius XM first directs me to *Carovillano v. Sirius XM Radio Inc.*, in which plaintiffs filed a putative class action against Sirius XM for, as here, "Sirius XM['s] fail[ure] to properly disclose certain fees charged to subscribers." 2024 WL 3460040 at *1 (S.D.N.Y. 2024). There, the court held that, pursuant to New York state law, the Customer Agreement was a binding contract that fit well into settled law concerning "clickwrap" agreements. *Id.* at *7. Because plaintiffs verbally consented to "these terms" after communicating with the Sirius XM customer representative, they "bound themselves

to the [full] Customer Agreement." *Id.* The court discussed that whether or not plaintiffs read the full terms was inconsequential—"As is often true in the clickwrap context, it is likely the case that few users ever read the agreement at issue in th[at] case." *Id.*

There is an important distinction in this case. When discussing Sirius XM's "General Practices" in *Carovillano*, the court noted that in addition to the conversations with representatives and confirmation emails, "Sirius XM also sends physical 'Welcome Kits' to some customers in the mail, which include a hard copy of the Customer Agreement." *Id.* at *2. No such hard copy has been mentioned in this case.[5]

Similarly, the court in *Posternock v. Sirius XM Radio, Inc.* granted Sirius XM's motion to compel arbitration. 2025 WL 1114695 (D.N.J. Apr. 15, 2025). There again, the court concluded that a "reasonably prudent consumer in Plaintiff's position would have understood that by verbally assenting to 'these terms' during the phone or webchat sign-up process, she was agreeing to be bound by the full Customer Agreement referenced by the Sirius XM representative." *Id.* at *5. But that court also notes that "[a]s a part of [the free trial] promotion, Sirius XM mailed Plaintiff a physical 'Welcome Kit,' which included a letter and a hard copy of Sirius XM's Customer Agreement." *Id.* at *1. To whatever extent plaintiff in that case was able to mutually assent to the Customer Agreement, it was with the express knowledge that she was physically sent and therefore immediately able to access the full terms included within the Customer Agreement. Not so here.

Sirius XM appears to recognize the distinction between a customer having access to the full Customer Agreement (because Sirius XM provided it) and a customer being expected to conduct additional searches to understand the scope of a company's intended contract. It cites to

---

[5] At the hearing on the motion, counsel for Sirius XM acknowledged that this information is not in the record and additionally argued that the Welcome Kit was not necessary to demonstrate manifest assent. *See* Transcript of June 25, 2025 Hearing [Dkt. No. 50] at 11–13.

*Wright v. Sirius XM Radio Inc.*, a Central District of California case where the court held that the plaintiff "assented to the arbitration agreement because he initiated the relationship and continued to use his Sirius subscription *after receiving the Customer Agreement*." 2017 WL 4676580 at *6 (C.D. Cal. June 1, 2017) (emphasis added); *see also* Mot. 13 (citing to *Wright*). I agree with the position explained in that opinion – "this Court would not expect Sirius to negotiate its terms or read lengthy provisions over the phone. Instead, it is reasonable for Sirius to mail the provisions and give [plaintiffs] an opportunity to object." 2017 WL 4676580 at *6. It *would* be reasonable. Yet Sirius XM now takes the untenable position that when a customer initiates a subscription over the phone or through a chat service, it is outside of Sirius XM's responsibility to mail that customer a copy of the Customer Agreements or present a hyperlinked version of the Customer Agreement for the customer to review in advance of agreeing to all of "th[o]se terms" contained therein.

Merely mentioning the existence of a Customer Agreement, telling customers that they can visit the website to locate and then view those Agreements, and not explaining that the Customer Agreement contains additional terms other than those explicitly mentioned in conversation up to that point, cannot amount to "mutual assent" to those additional terms in the Customer Agreement as contemplated by California law. Sirius XM's conduct does not translate to either a "clickwrap" agreement nor the now heavily disfavored "browsewrap" agreement, but I view this set of facts to be closer on the spectrum to the latter. *See Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (explaining the difference between the two types of agreements). In browsewrap agreements, "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.* For clickwrap agreements, "a website *presents users with specified contractual terms* on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Id.* (emphasis added).

12

Sirius XM does not present users with the specific contractual term of an arbitration agreement. Rather, it says they can go to a website to find a Customer Agreement with undescribed terms. At no point does Sirius XM make clear to any user that the Customer Agreement includes an agreement to arbitrate.

"Sirius XM, as the party seeking to compel arbitration, has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson*, 771 F.3d at 565. It has failed to present caselaw that is on all fours with the facts in the case before me now. I conclude that plaintiffs here did not mutually assent to the full terms of the Customer Agreement and, in turn, did not consent to the arbitration provision of the Agreement.[6] The arbitration agreement is invalid, and I DENY Sirius XM's Motion to Compel.[7]

## CONCLUSION

For the foregoing reasons, Sirius XM's motion to compel arbitration is DENIED. A Case Management Conference is set for August 12, 2025, at 2:00 p.m. The Joint Case Management Statement is due August 5, 2025.

**IT IS SO ORDERED.**

Dated: July 11, 2025



William H. Orrick
United States District Judge

---

[6] Sirius XM additionally argues that California law is clear that "a party's decision to retain the benefits of an offer suffices to manifest consent, even if he does not otherwise respond to the offer." Mot. 12 (citing to *Bischoff v. DirectTV, Inc.*, 180 F. Supp. 2d 1097, 1105 (C.D. Cal. 2002). Although that is true, Sirius XM cites only to cases where the full contract terms were made available to customers in advance of any manifest assent. That Sirius XM sent a "confirmation" email that linked the Customer Agreement containing the arbitration clause *after* Woods and Tapia had already agreed verbally (for Woods) or via chat (for Tapia) to "these terms" is of no moment. It is black letter law that a contractor cannot add additional terms to a contract after the fact.

[7] Because I conclude that the arbitration agreement is unenforceable, I decline to address Sirius XM's additional arguments concerning the scope of arbitration and the impact of arbitration on public injunctive relief.

13